UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| ALLIANCE COMMUNICATIONS COOPERATIVE, INC.; BERESFORD MUNICIPAL TELEPHONE COMPANY; INTERSTATE TELECOMMUNICATIONS COOPERATIVE, INC.; KENNEBEC TELEPHONE COMPANY, INC.; MCCOOK COOPERATIVE TELEPHONE COMPANY; and SPLITROCK PROPERTIES, INC., | ) ) ) ) ) ) ) ) ) ) ) | Civ. 06-4221-KES |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | **ORDER** |
| GLOBAL CROSSING TELECOMMUNICATIONS, INC., | ) ) ) | |
| Defendant and Third-Party Plaintiff, | ) ) ) ) | |
| vs. | ) ) ) | |
| GOLDEN WEST TELECOMMUNICATIONS COOPERATIVE, INC.; BRIDGEWATER-CANISTOTA INDEPENDENT TELEPHONE COMPANY; VIVIAN TELEPHONE COMPANY; JAMES VALLEY COOPERATIVE TELEPHONE COMPANY; NORTHERN VALLEY COMMUNICATIONS, LLC; MIDSTATE COMMUNICATIONS, INC.; MIDSTATE TELECOM, INC.; VALLEY TELECOMMUNICATIONS COOPERATIVE ASSOCIATION, INC.; VENTURE COMMUNICATIONS COOPERATIVE, INC.; WESTERN TELEPHONE COMPANY; FAITH MUNICIPAL TELEPHONE COMPANY; ONVOY, INC.; TRANS NATIONAL COMMUNICATIONS INTERNATIONAL, INC.; EXPRESS COMMUNICATIONS, INC.; and SOUTH DAKOTA NETWORKS, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Third-Party Defendants. | ) | |

GOLDEN WEST TELECOMMUNICATIONS       Civ. 06-3023-KES
COOPERATIVE, INC.; )
BRIDGEWATER CANISTOTA INDEPENDENT )
TELEPHONE COMPANY; )
VIVIAN TELEPHONE COMPANY; )
JAMES VALLEY COOPERATIVE TELEPHONE )
COMPANY; )
NORTHERN VALLEY COMMUNICATIONS, LLC; )
MIDSTATE COMMUNICATIONS, INC.; )
MIDSTATE TELECOM, INC.; )
SIOUX VALLEY TELEPHONE COMPANY; )
VALLEY TELECOMMUNICATIONS COOPERATIVE )
ASSOCIATION, INC.; )
VENTURE COMMUNICATIONS COOPERATIVE, )
INC.; )
WEST RIVER COOPERATIVE TELEPHONE )
COMPANY; )
SOUTH DAKOTA NETWORK, LLC; )
)
        Plaintiffs, )
)
   vs. )
)
ONVOY, INC. and )
TRANS NATIONAL COMMUNICATIONS )
INTERNATIONAL, INC. )
)
        Defendants, )
)
)
GLOBAL CROSSING TELECOMMUNICATIONS, )
INC.; )
)
        Defendant and )
        Third-Party Plaintiff, )
   vs. )
)
EXPRESS COMMUNICATIONS, INC., )
ALLIANCE COMMUNICATIONS COOPERATIVE, )
INC.; )
BERESFORD MUNICIPAL TELEPHONE )
COMPANY; )
INTERSTATE TELECOMMUNICATIONS )
COOPERATIVE, INC.; )
KENNEBEC TELEPHONE COMPANY, INC.; )
MCCOOK COOPERATIVE TELEPHONE )
COMPANY; )
SPLITROCK PROPERTIES, INC., )
)
        Third-Party Defendants )

2

GOLDEN WEST TELECOMMUNICATIONS    )    Civ. 06-3025-KES
COOPERATIVE, INC.;         )
BRIDGEWATER CANISTOTA INDEPENDENT )
TELEPHONE COMPANY;       )
VIVIAN TELEPHONE COMPANY;     )
JAMES VALLEY COOPERATIVE TELEPHONE  )
COMPANY;            )
NORTHERN VALLEY COMMUNICATIONS, LLC; )
MIDSTATE COMMUNICATIONS, INC.;   )
MIDSTATE TELECOM, INC.;      )
SIOUX VALLEY TELEPHONE COMPANY;   )
VALLEY TELECOMMUNICATIONS COOPERATIVE )
ASSOCIATION, INC.;        )
VENTURE COMMUNICATIONS COOPERATIVE, )
INC.;             )
WEST RIVER COOPERATIVE TELEPHONE  )
COMPANY;            )
WESTERN TELEPHONE COMPANY;    )
FAITH MUNICIPAL TELEPHONE COMPANY;  )
CHEYENNE RIVER SIOUX TRIBE TELEPHONE )
AUTHORITY;          )
RC COMMUNICATIONS, INC.;     )
UNION TELEPHONE COMPANY OF HARTFORD; )
ARMOUR INDEPENDENT TELEPHONE   )
COMPANY; and         )
SOUTH DAKOTA NETWORK, LLC,    )
              )
    Plaintiffs,       )
  vs.           )
              )
ONVOY, INC.;         )
TRANS NATIONAL COMMUNICATIONS   )
INTERNATIONAL, INC.;       )
              )
    Defendants,      )
              )
  and          )
              )
SPRINT COMMUNICATIONS COMPANY LIMITED )
PARTNERSHIP,         )
              )
    Defendant and     )
    Third-Party Plaintiff,   )
              )
  vs.           )
              )
EXPRESS COMMUNICATIONS, INC.,    )
              )
    Third-Party Defendant.   )

KENNEBEC TELEPHONE COMPANY, INC. and   )   Civ. 06-4144-KES
SANTEL COMMUNICATIONS COOPERATIVE,     )
INC.,                                  )
                                       )
       Plaintiffs,                    )
                                       )
  vs.                              )
                                       )
SPRINT COMMUNICATIONS COMPANY          )
LIMITED PARTNERSHIP,                   )
                                       )
       Defendant and                  )
       Third-Party Plaintiff,         )
                                       )
  vs.                              )
                                       )
EXPRESS COMMUNICATIONS, INC.,          )
                                       )
       Third-Party Defendant.

_____   Civ.  07-3003-KES

ALLIANCE COMMUNICATIONS COOPERATIVE,   )
INC.;                                  )
BERESFORD MUNICIPAL TELEPHONE          )
COMPANY;                               )
INTERSTATE TELECOMMUNICATIONS          )
COOPERATIVE, INC.;                     )
MCCOOK COOPERATIVE TELEPHONE           )
COMPANY;                               )
SPLITROCK PROPERTIES, INC.;            )
STOCKHOLM-STRANDBURG TELEPHONE         )
COMPANY and                            )
TRI-COUNTY TELECOM, INC.;              )
                                       )
       Plaintiffs,                    )
                                       )
  vs.                              )
                                       )
SPRINT COMMUNICATIONS COMPANY LIMITED  )
PARTNERSHIP,                           )
                                       )
       Defendant and                  )
       Third-Party Plaintiff,         )
                                       )
  vs.                              )
                                       )
EXPRESS COMMUNICATIONS, INC.,          )
                                       )
       Third-Party Defendant and      )
       Fourth-Party Plaintiff,        )

|                                      |     |
|--------------------------------------|-----|
| vs.                                  | )   |
|                                      | )   |
| ONVOY, INC. and                      | )   |
| TRANS NATIONAL COMMUNICATIONS        | )   |
| INTERNATIONAL, INC.,                 | )   |
|                                      | )   |
|   Fourth-Party Defendants. | )   |

Plaintiffs filed this consolidated action against defendants, Onvoy, Inc. (Onvoy), Trans National Communications International, Inc. (TNCI), Global Crossing Telecommunications, Inc. (Global Crossing), and Sprint Communications Company Limited Partnership (Sprint), to recover access charges allegedly owed pursuant to plaintiffs' tariffs filed with the Federal Communications Commission (FCC) and the South Dakota Public Utilities Commission (SDPUC).[1]  Global Crossing then filed a multi-count counterclaim against plaintiffs and a third-party complaint against Express Communications, Inc. (Express).  Sprint also filed a third-party complaint against Express.  Currently before the court are various motions for summary judgment.  Defendants move for summary judgment on plaintiffs' claims,

---

[1] The consolidated action currently before the court is composed of five member cases.  In each member case, a group of plaintiff-local exchange carriers and South Dakota Network, LLC, brought suit against Onvoy, TNCI, and either Global Crossing or Sprint.  Global Crossing is named as a defendant in member cases Civ. 06-3023 and Civ. 06-4221.  Sprint is named as a defendant in member cases Civ. 06-3025, Civ. 06-4144, and Civ. 07-3003.  The court consolidated the two Global Crossing cases on February 5, 2007, and then consolidated all five cases on July 2, 2007.  Docket 33, Docket 99.  All citations to the docket refer to the docket in the lead case, Civ. 06-4221, unless otherwise noted.

plaintiffs move for summary judgment on Global Crossing's counterclaims, and

Express moves for summary judgment on Global Crossing's and Sprint's claims

against Express. All of the motions are opposed.

## BACKGROUND

The facts, as relevant to the pending motions,[2] are as follows: all of the

plaintiffs, except South Dakota Network, LLC (SDN), are local exchange carriers

(LECs) located in South Dakota that provide telecommunication services to

their customers and originating and terminating access services to

interexchange (IXC) carriers.[3] Because plaintiff-LECs' access charges pertain

---

[2] On a motion for summary judgment, the nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980). Because the court is considering defendants' motions for summary judgment on plaintiffs' claims as well as plaintiffs' and Express's motions for summary judgment on Global Crossing's and Sprint's claims, the court states the undisputed facts and notes the disputed facts without drawing reasonable inferences in favor of any of the parties. The court will give the nonmoving party the benefit of all reasonable inferences to be drawn from the underlying facts in the record when considering each individual motion for summary judgment.

[3] By way of background, there are two types of telecommunications providers, LECs and IXCs. LECs provide the service and own the hardware that connects to individual customers in their local areas. By contrast, IXCs, commonly known as long-distance carriers, own the hardware that connects different local carriers. In general, when an individual makes a long-distance telephone call, the call is originated on wires and facilities owned by the LEC serving the individual making the call and the call is terminated over wires and facilities owned by the LEC serving the individual receiving the call. IXCs pay "originating" and "terminating" access charges to the LECs that serve individuals who initiate and receive long-distance calls, respectively. The rates charged for access service are determined by the published tariff rate, which is

6

to interstate and intrastate communications, they filed tariffs with both the FCC and the SDPUC, pursuant to federal and state regulations.[4]  Plaintiff-LECs, along with other South Dakota LECs that are not part of this action, formed SDN to provide a single point of connection for IXCs to gain access to all of the LECs that formed SDN.  SDN operates a tandem switch and provides centralized equal access services, which allow IXCs to connect to the LECs' customers without connecting directly to each individual LEC across the state.  The rates, terms, and conditions of SDN's centralized equal access services are governed by SDN's tariffs, which were filed with the FCC and SDPUC.[5]

Generally, when an end user customer of one of plaintiff-LECs dials a long-distance call, the call is routed through the LEC's switch to SDN.  SDN then completes a prescribed interexchange carrier (PIC) lookup to determine

---

filed with and reviewed by the FCC (for purely interstate communications) or the applicable state utility commission (for intrastate communications).

[4] With respect to the FCC, each plaintiff-LEC filed a tariff that refers to and incorporates the terms and conditions of the National Exchange Carrier Association, Inc.'s Tariff F.C.C. No. 5 (NECA Tariff) (available at Docket 193-7).  With respect to the SDPUC, each plaintiff-LEC filed a tariff that refers to and incorporates the terms and conditions of the Local Exchange Carrier Association, Inc.'s Tariff No. 1 filed with the SDPUC (LECA Tariff) (available at Docket 192-6).  Thus, the relevant tariffs for plaintiff-LECs are the NECA Tariff and the LECA Tariff.

[5] SDN filed SDN's Tariff F.C.C. No. 1 (SDN F.C.C. Tariff) (available at Dockets 192-6 and 239-18) with the FCC and SDN's South Dakota Tariff No. 2 (SDN South Dakota Tariff) (available at Dockets 186-4 and 186-5) with the SDPUC.

which IXC the end user has chosen as her long-distance provider. SDN then assigns the call the carrier identification code (CIC) associated with the end user's IXC and routes the call to the appropriate IXC.

Plaintiff-LECs, along with other South Dakota LECs that are not part of this action, later formed Express to enable plaintiff-LECs to provide long-distance services to their end users. Plaintiff-LECs generally offer long-distance service to their customers under their own names, rather than under the Express name. Express is an IXC that is certified by the SDPUC and provides interstate long-distance services pursuant to FCC authorization. But Express does not have any facilities of its own. As a result, Express must contract with a facility-based carrier to carry the long-distance traffic from SDN's switch to the end user receiving the call.

The traffic at issue in this case originated with plaintiff-LECs' end user customers who subscribed to Express's long-distance services (usually through the applicable LEC), was passed through the SDN switch, and was carried to the end user receiving the call. Several telecommunication companies were involved with carrying this traffic (hereinafter referred to as "the Express traffic") to end users. The issue of which company is responsible for paying the access fees associated with the Express traffic is at the heart of this litigation.

In September of 2004, Express entered into a contract with Onvoy under which Onvoy agreed to provide Express with "wholesale switchless long

distance services, provisioned through Onvoy's network." Switchless Long Distance Services Addendum to Onvoy Wholesale Voice Master Service Agreement (Express-Onvoy Addendum), ¶ 1, Docket 178-6; <u>see also</u> Onvoy Wholesale Voice Master Service Agreement (Express-Onvoy Agreement), Docket 178-6; and First Amendment to Onvoy Wholesale Voice Master Service Agreement and Switchless Long Distance Services Addendum, Docket 178-6.[6] Express and Onvoy agreed that Onvoy would transport the Express traffic from Express's switch in Sioux Falls, South Dakota, to Onvoy's switch in Plymouth, Minnesota. Express-Onvoy Addendum, ¶ 7(d). Onvoy picked up the Express traffic at SDN's tandem in Sioux Falls. The Express traffic traveled from SDN's tandem to Onvoy's network with Express's CIC, as required by the Express-Onvoy agreement.

The Express-Onvoy agreement obligated Express to "operate as an IXC in compliance with State and Federal rules and regulations." Express-Onvoy Addendum, ¶ 6(c). Express was also obligated to send Onvoy access service requests as needed for service changes and to ensure that the CIC specified by

---

[6] Express asserted breach of contract, negligent misrepresentation, and breach of the covenant of good faith and fair dealing claims against Onvoy arising out of the Express-Onvoy agreement. These claims were dismissed without prejudice because of the forum selection clause in the Express-Onvoy Agreement. Order, Docket 99 at 33-35; Order, Docket 116 at 9-11; Memorandum Opinion and Order, Docket 53 (Civ. 06-4144) at 4-6. Thus, issues relating to the contractual obligations of Express and Onvoy are not before this court.

Onvoy's underlying carrier was on all carrier access billing system records. Id. ¶ 6(a)-(b). For its part, in addition to transporting Express's traffic from SDN's switch in Sioux Falls to Onvoy's switch in Plymouth, Onvoy was obligated to set up and test Express's CIC code in its switch. Id. ¶ 7(a).

According to Mark Shlanta, CEO of SDN and Express, Express expected that the product it purchased from Onvoy was one where the underlying carriers of the Express traffic would be responsible for the payment of plaintiffs' originating and centralized equal access charges. Affidavit of Mark Shlanta, Docket 192-5 at 8-13, ¶ 3.

The parties dispute whether Express or Onvoy ordered SDN to direct the Express traffic to Onvoy. Defendants argue that Express directed SDN to route the traffic to Onvoy's trunk group that was established to accept the Express traffic, a fact that Shlanta agreed to during his deposition. Deposition of Mark Shlanta, Docket 192 at 198, lines 14-19. Plaintiffs assert that Onvoy, rather than Express, directed SDN to route the Express traffic to the Onvoy trunk group. Indeed, Shlanta stated by affidavit that Onvoy requested services from SDN in September 2004. Affidavit of Mark Shlanta, ¶ 4. Onvoy supplied to SDN twenty-two T-1s connecting Onvoy's switch in Plymouth to SDN's switch in Sioux Falls. Id. Thus, Shlanta stated, "SDN believes that the entity which ordered services from Plaintiffs was Onvoy. Onvoy did submit an order to SDN for the 22 T-1s and did actually receive services from the Plaintiffs." Id. ¶ 9. It

is undisputed that Onvoy has no direct contractual relationship with plaintiff-LECs or SDN.

Onvoy entered into an agreement with TNCI, a reseller/biller of telecommunication services, in June of 2004. As a reseller of telecommunication services, TNCI purchases long-distance services in bulk from national telecommunication carriers like Global Crossing and Sprint. It then resells those services to customers like Onvoy at a price lower than the price for which the customer itself could buy the service directly from the carriers. TNCI does not own switching equipment or have its own network facilities, and did not own or maintain any facilities in South Dakota during the relevant times. TNCI also did not submit an access service order pursuant to plaintiff-LECs' or SDN's tariffs or interact directly with any of plaintiffs.

Under the Onvoy-TNCI agreement, TNCI agreed to provide telecommunication services to Onvoy, and Onvoy agreed to pay for these services.[7] Specifically, TNCI agreed to arrange for transport service and long-

_____

[7] The principal contract documents between Onvoy and TNCI are a Letter of Agency and its attachments, including Attachment A: Terms and Conditions, Appendix 1 to Attachment A: Terms and Conditions, and Attachment B to Service Documents. <u>See</u> Docket 211-8.

Express filed cross-claims against TNCI asserting that Express was a third-party beneficiary of the Onvoy-TNCI agreement and that TNCI breached this agreement. These claims were dismissed without prejudice because of the forum selection clause in Attachment A: Terms and Conditions to the Letter of Agency. Order, Docket 99 at 31-33; Order, Docket 116 at 6-8; Memorandum Opinion and Order, Docket 53 (Civ. 06-4144) at 5-6. Thus, claims that TNCI

distance connectivity for calls originating at Onvoy's facilities in Minnesota.

The Letter of Agency further provides,

> TNCI's underlying carrier shall pay all access charges and centralized equal access charges for traffic carried under this contract, based upon the specific terms of the existing agreement between the underlying carrier and TNCI. This does include all originating and terminating access charges however it does not include recurring charge[s] for the dedicated access facilities that are being utilized by [Onvoy] to route traffic to TNCI's underlying carrier.

Attachment A: Terms and Conditions, ¶ 4.

As the Onvoy-TNCI agreement contemplates, in order to provide services to Onvoy, TNCI contracted with underlying carriers to carry Onvoy's traffic. TNCI's underlying carriers for the Express traffic at issue in this case were Global Crossing and Sprint.

Global Crossing is a nationwide long-distance carrier that has its own end-user customers and also provides wholesale services to other long-distance carriers. Unrelated to the traffic at issue in this case, Global Crossing acquired Feature Group D services and facilities from plaintiff-LECs and centralized equal access services from SDN pursuant to plaintiff-LECs' and SDN's filed tariffs. That is, Global Crossing purchased terminating access services from plaintiff-LECs and SDN in order to complete calls from Global Crossing's subscribers to end users located in the territories served by plaintiff-LECs.

_____

breached the Onvoy-TNCI agreement are not before this court.

Global Crossing also purchased originating access services in order to provide retail long-distance services to Global Crossing's own customers located in those territories. These terminating and originating access charges are not at issue in this case. Further, none of the Express traffic at issue in this case traversed the Feature Group D facilities ordered by Global Crossing to facilitate the above-described traffic. Global Crossing was not a party to the Express-Onvoy agreement or the Onvoy-TNCI agreement.

Global Crossing carried the Express traffic pursuant to an arrangement with TNCI. When TNCI contracted with Onvoy to provide telecommunication services with respect to the Express traffic in June 2004, TNCI had an existing contract with Global Crossing under which TNCI resold Global Crossing's long-distance telecommunication services. TNCI asserts that it contacted Global Crossing to have Global Crossing set up access at Onvoy's facilities in Minnesota so that Global Crossing could carry traffic from Onvoy's facilities to the called destination. TNCI asserts that its only role in establishing the connection between Onvoy's facilities and Global Crossing's facilities was to pass the necessary information from Onvoy to Global Crossing so that the companies could cross-connect at a common facility in Minneapolis, Minnesota. Thus, TNCI asserts, once the cross-connection was set up, Onvoy passed traffic directly from its network to Global Crossing's network. Plaintiffs assert that TNCI ordered, leased, and exercised control over the facilities

required to connect Onvoy and Global Crossing, and that Onvoy's trunks were connected to TNCI. It is undisputed that Global Crossing did not bill TNCI for arranging the cross-connect and that TNCI did not bill Onvoy for the same. Global Crossing carried the Express traffic to end users in November and December 2004.

Sprint is also a nation-wide long-distance carrier. Like Global Crossing, Sprint ordered Feature Group D facilities from plaintiffs. The traffic that traversed these facilities and the associated access charges are not at issue in this case. Also like Global Crossing, Sprint was not a party to the Express-Onvoy or Onvoy-TNCI agreements.

Sprint also came to carry the Express traffic through an arrangement with TNCI. TNCI asserts that after contracting with Onvoy to provide telecommunication services with respect to the Express traffic, TNCI arranged for Sprint to set up a DS-3 access line to carry traffic from Onvoy's facilities in Minnesota to the called destination via Sprint's network. TNCI asserts that its only role in this connection was providing Onvoy's information to Sprint so that Sprint could connect to Onvoy's facilities via the DS-3 loop. Sprint then connected the DS-3 loop to an assigned circuit facility owned by Onvoy in Minnesota. Thus, TNCI asserts, Onvoy passed traffic directly from its facilities in Minnesota onto Sprint's network. Plaintiffs assert that TNCI ordered the DS-3 loop required to connect Onvoy and Sprint and that Onvoy's trunks were

connected to TNCI.  It is undisputed that Sprint charged TNCI for the DS-3 loop, but TNCI did not pass this charge onto Onvoy.  Sprint carried the Express traffic to end users from December 2004 through May 2005.

Plaintiff-LECs and SDN sent Global Crossing bills for originating access and centralized equal access services for November and December 2004. Plaintiffs assert that they were instructed by Express, which was instructed by Onvoy, to bill Global Crossing for the originating access services associated with the Express traffic.  Plaintiffs' bills also contained originating and terminating access charges for traffic that traversed the Feature Group D facilities that Global Crossing ordered from plaintiffs, but did not indicate which originating access charges were associated with this traffic and which were associated with the Express traffic.  Because plaintiffs' November and December 2004 bills were significantly higher than the bills Global Crossing had previously received, Global Crossing inquired about the source of the charges.  Plaintiffs, through Shlanta, informed Global Crossing that the charges at issue arose from the Express traffic.  Global Crossing has disputed all of the charges on plaintiffs' invoices.

Likewise, plaintiff-LECs and SDN billed Sprint for originating access and centralized equal access services for December 2004 through May 2005. Plaintiffs' bills did not differentiate between the originating access charges associated with the traffic that traversed the Feature Group D facilities and the

charges associated with the Express traffic. Plaintiffs were instructed by Onvoy to bill Sprint for the Express traffic. Sprint believed that plaintiff-LECs had billed Sprint for more minutes than Sprint measured, so Sprint paid plaintiff-LECs for the minutes Sprint believed were properly accounted for and disputed the balance of the minutes. Sprint discussed the billing dispute with representatives of several plaintiffs in March and April 2005, and informed Shlanta that the charges associated with the Express traffic should not be billed to Sprint.

Neither plaintiff-LECs nor SDN sent invoices to Onvoy or TNCI for the unpaid originating access and centralized equal access charges.

Onvoy stopped routing the Express traffic on May 5, 2005. Plaintiffs assert that SDN, acting at Onvoy's direction, ceased routing this traffic to Onvoy because Onvoy was unable to ensure that plaintiffs could expect payment of all their access charges. Defendants assert that it was Express that stopped routing the traffic to Onvoy.

Plaintiff-LECs and SDN filed suit against Onvoy, TNCI, Global Crossing, and Sprint, seeking to recover amounts owed for originating and centralized equal access charges under plaintiffs' tariffs. Plaintiffs also brought a claim of unjust enrichment against Global Crossing, which was subsequently dismissed by this court, and Sprint, which is still pending. Plaintiffs' suit was met with a flurry of counterclaims, third-party complaints, and cross-claims. As is

relevant to this order, Global Crossing filed a multi-count counterclaim against plaintiff-LECs and SDN, alleging violations of §§ 201(b), 202(a), and 203(c) of the Communications Act, violation of the FCC's Truth-in-Billing regulations, violations of SDCL 49-31-12.2(3) and 49-31-11, and deceit.[8] Global Crossing also filed a third-party complaint against Express, alleging quantum meruit/unjust enrichment and deceit. Likewise, Sprint brought a third-party complaint for indemnification against Express. Pending before the court are Onvoy's, TNCI's, Global Crossing's, and Sprint's motions for summary judgment on plaintiffs' claims, plaintiffs' motion for summary judgment on Global Crossing's counterclaims, and Express's motion for summary judgment on the third-party claims brought by Global Crossing and Sprint.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude

---

[8] Global Crossing also filed a third-party complaint against Onvoy and TNCI. Global Crossing's claims against TNCI were previously dismissed by this court, and its surviving claim against Onvoy is not before the court at this time.

summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106

S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  Summary judgment is not appropriate if

a dispute about a material fact is genuine, that is, if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party.  Id.

The moving party bears the burden of bringing forward sufficient

evidence to establish that there are no genuine issues of material fact and that

the movant is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett,

477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The nonmoving

party is entitled to the benefit of all reasonable inferences to be drawn from the

underlying facts in the record.  Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d

1076, 1077 (8th Cir. 1980).  The nonmoving party may not, however, merely

rest upon allegations or denials in its pleadings, but must set forth specific

facts by affidavits or otherwise showing that a genuine issue exists.  Forrest v.

Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

## DISCUSSION

**I.      Defendants' Motions for Summary Judgment on Plaintiffs' Claims**

**A.      Recovery of Access Charges under Plaintiffs' Tariffs**

Plaintiffs seek to recover originating access charges[9] from Onvoy, TNCI,

Global Crossing, and Sprint pursuant to plaintiffs' tariffs filed with the FCC

---

[9] Adopting the practice of the parties, the court will use "originating access charges" to refer to the access charges associated with plaintiff-LECs' originating access services as well as SDN's centralized equal access services.

18

and SDPUC.  Under section 203(a) of the Communications Act, plaintiffs are required to file tariffs with the FCC "showing all charges" and "showing the classifications, practices, and regulations affecting such charges."  47 U.S.C. § 203(a).  These tariffs have the effect of law.  <u>See</u> <u>American Tel. & Tel. Co. v. Central Office Telephone, Inc.</u>, 524 U.S. 214, 221-22, 118 S. Ct. 1956, 141 L. Ed. 2d 222 (1998) ("Section 203(c) makes it unlawful for a carrier to 'extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.' " (quoting 47 U.S.C. § 203(c)).  Under the so-called filed rate doctrine, "once a carrier's tariff is approved by the FCC, the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer.' " <u>Iowa Network Servs., Inc. v. Qwest Corp.</u>, 466 F.3d 1091, 1097 (8th Cir. 2006) (quoting <u>Evanns v. AT & T Corp.</u>, 229 F.3d 837, 840 (9th Cir. 2000)) (alteration in original).  This doctrine is equally applicable to rates filed with state regulatory agencies.  <u>Firstcom, Inc. v. Qwest Corp.</u>, 555 F.3d 669, 679 (8th Cir. 2009).

Plaintiffs allege that each defendant is liable for originating access charges associated with the Express traffic.  To recover for amounts charged pursuant to their tariffs, "plaintiffs must demonstrate (1) that they operated under a federally filed tariff and (2) that they provided services to the customer

pursuant to that tariff." Advamtel LLC v. AT & T Corp., 118 F. Supp. 2d 680, 683 (E.D. Va. 2000) (Advamtel I). There is no dispute that plaintiffs operated under valid tariffs. The parties dispute, however, whether each defendant was a customer that received services pursuant to plaintiffs' tariffs.

The court begins by looking at the terms of the applicable tariffs. See American Tel. & Tel. Co. v. City of New York, 83 F.3d 549, 552 (2d Cir. 1996) (City of New York) (setting out terms of relevant tariff in determining whether defendant was customer of plaintiff and therefore obligated to pay charges under the tariff). The applicable tariffs apply to plaintiffs' "customers." The NECA Tariff states that it applies to services "provided to *customers*" and contains "Access Ordering regulations and charges that are applicable when these services are ordered or modified by the *customer*." NECA Tariff, § 1.1 (emphasis added); see also LECA Tariff, § 1.1 (containing identical language). Likewise, the SDN South Dakota Tariff "contains regulations, rates, and charges applicable to the provision of switched Access Service and other regulated services . . . provided by [SDN] to *customers*." SDN South Dakota Tariff, § 1.1. The court does not have before it section 1.1 of the SDN F.C.C. Tariff, but the parties agree that this tariff applies to SDN's customers as well.

Each tariff contains a definition of "customer." The NECA Tariff and SDN F.C.C. Tariff define "customer" as "any individual, partnership, association, joint-stock company, trust, corporation, or governmental entity or other entity

20

which subscribes to the services offered under this tariff, including both Interexchange Carriers (ICs) and End Users." NECA Tariff, § 2.6; SDN F.C.C. Tariff, § 2.6. The LECA Tariff provides a nearly identical definition of "customer." LECA Tariff, § 2.6 ("The term 'Customer(s)' denotes any individual, partnership, association, joint-stock company, trust, corporation, or governmental entity or other entity which subscribes to the services offered under this tariff, including Interexchange Carriers (Ics)."). The court does not have before it the SDN South Dakota Tariff's definition of customer, but the parties agree that a customer under this tariff is an individual or entity that subscribes to the services offered therein.

Thus, under plaintiffs' tariffs, a customer is an entity that "subscribes" to the services offered under the tariff. Here, the services offered under plaintiffs' tariffs are switched access services, which will be defined in greater detail below. An individual or entity may subscribe to these services by following the ordering provisions contained in plaintiffs' tariffs. See, e.g., NECA Tariff, § 5.1 ("This section sets forth the regulations and order related charges for services set forth in other sections of this tariff."). For example, under the SDN F.C.C. Tariff, customers may order access services by submitting an Access Order. SDN F.C.C. Tariff, § 5.1. "An Access Order is an order to provide the customer with Access Service, access related services, or to provide changes to existing services." Id. Further, "Access Service may be ordered from SDN. A customer

may order any number of services of the same type . . . between the customer's point of termination at SDN's central access tandem and a Routing Exchange Carrier's point of interconnection." Id. § 5.1.1; see also NECA Tariff, § 5.1 (stating that customers may obtain services under the tariff by submitting an Access Order).

It is undisputed that none of defendants subscribed to plaintiffs' switched access services by submitting an Access Order as prescribed in the tariffs.[10] But courts have recognized that a person can "order" services provided under a tariff "in one of two ways: (1) by affirmatively ordering . . . or (2) by constructively ordering" the service. City of New York, 83 F.3d at 553. Thus, even if an entity does not order services under the procedure set forth in the applicable tariff, it may be deemed to have ordered those services if the requirements of the constructive ordering doctrine are satisfied. AT&T Commc'ns of the Midwest, Inc. v. Iowa Utils. Bd., 687 N.W.2d 554, 561 (Iowa

---

[10] Express, which is not a party to the claims brought by plaintiffs against Onvoy, TNCI, Global Crossing, and Sprint, takes the position that "Onvoy is the customer that affirmatively ordered services under the SDN tariff." Express Communications, Inc.'s Memorandum in Support of its Motion for Summary Judgment, Docket 242 at 18. Despite Express's close relationship with plaintiff-LECs and SDN, for the purposes of the claims currently under consideration, the parties do not dispute that none of defendants affirmatively ordered services under the applicable tariffs.

2004) ("[T]he 'constructive order[ing]' doctrine applies to those situations in which the services are not ordered in the manner prescribed by the tariff.").[11]

The constructive ordering doctrine originated in the F.C.C.'s decision in United Artists Payphone Corp. v. New York Telephone Co., 1993 WL 757204, 8 F.C.C.R. 5563, (1993). There, the F.C.C. reasoned that a company may be deemed to have "constructively 'ordered'" services under a tariff if it "failed to take steps to control unauthorized [calls]." Id. ¶ 13. In United Artists, the F.C.C. found that the defendant company "took reasonable steps to secure . . . against fraudulent calling and . . . therefore did not constructively order the services used to make the calls at issue." Id. ¶ 15. The constructive ordering

---

[11] The constructive ordering doctrine applies in this case even though plaintiffs' tariffs indicate that a customer is an entity that "subscribes" to the services offered under the tariff, rather than an entity that "orders" those services. Plaintiffs' tariffs use the words "subscribe" and "order" interchangeably. For example, the SDN F.C.C. Tariff defines "customer" as an individual or entity that "subscribes" to the services offered under the tariff, but later explains how customers may "order" access services. SDN F.C.C. Tariff, § 2.6 (defining "customer") and § 5.1 (indicating that "[a]n Access Order is an order to provide the customer with Access Service," "Access Service may be ordered from SDN," and a "customer may order any number of services"). See also NECA Tariff, § 5.2.1 ("When *ordering* Switched Access service, the customer must specify the directionality of the service." (emphasis added)); LECA Tariff, § 1.1 ("This tariff also contains Access Ordering regulations and charges that are applicable when these services are *ordered* or modified by the customer." (emphasis added)); and SDN South Dakota Tariff, § 1.2 (discussing "any switched access service *ordered* under this tariff") (emphasis added). Because plaintiffs' tariffs indicate that there is no substantive distinction between "subscribing to" and "ordering" services offered under the tariff, the court finds that an entity that meets all three criteria of the constructive ordering doctrine has "subscribed" to the services offered therein and, as such, is a customer under the tariff.

doctrine announced in United Artists has been applied in several cases to find an entity potentially liable for charges under a tariff even when it did not order services as proscribed in the tariff.  See City of New York, 83 F.3d at 554-55 (finding material issue of fact regarding whether defendant took reasonable steps to prevent unauthorized calls); AT & T Corp. v. Cmty. Health Group, 931 F. Supp. 719, 723 (S.D. Cal. 1995) (Community Health Group) (finding that defendant was customer under constructive ordering doctrine).

Under the constructive ordering doctrine as applied in United Artists and its progeny, a party receiving services is deemed to have ordered the services "when the receiver of services (1) is interconnected in such a manner that it can expect to receive access services; (2) fails to take reasonable steps to prevent the receipt of services; and (3) does in fact receive such services." Advamtel I, 118 F. Supp. 2d at 685; see also AT&T Commc'ns of the Midwest, Inc., 687 N.W.2d at 561.

Under this test, for a party to be deemed to have constructively ordered services, it must have actually received the services offered under the applicable tariff.  Plaintiffs' tariffs contain descriptions of the services offered therein.  The NECA Tariff and LECA Tariff describe switched access service as follows:

> Switched Access Service, which is available to customers for their use in furnishing their services to end users, provides a two-point communications path between a customer designated premises and an end user's premises.  It provides for the use of common

terminating, switching, and trunking facilities and for the use of common subscriber plant of the Telephone Company. Switched Access Service provides for the ability to originate calls from an end user's premises to a customer designated premises, and to terminate calls from a customer designated premises to an end user's premises in the LATA [local access and transport area] where it is provided.

NECA Tariff, § 6.1; LECA Tariff, § 6.1.

Similarly, SDN's South Dakota Tariff explains,

Switched Access Service, when combined with the services offered by Exchange Telephone Companies, is available to customers for their use in furnishing their services to end users. SDN provides a two-point electrical communications path with the transmission facilities of an Exchange Telephone Company and SDN's centralized equal access tandem where the customer's traffic is switched to originate or terminate its communications. It also provides for the switching facilities at SDN's centralized equal access tandem. SDN's centralized equal access tandem is SDN's switching system located in Sioux Falls, South Dakota, that provides the software for equal access and a concentration and distribution function for originating and terminating traffic between the end offices of Participating Telecommunications Companies . . . and the SDN access tandem. The customer's point of interconnection is the demarcation point or network interface between SDN's communications facilities and customer provided facilities.

SDN South Dakota Tariff, § 5.1. The explanation of switched access service in the SDN F.C.C. Tariff is very similar. SDN F.C.C. Tariff, § 6.1 ("Switched Access Service, when combined with the services offered by Exchange Telephone Companies, is available to customers. SDN provides a communications path between the transmission facilities of a Routing

Exchange Carrier listed in Section 9 following[12] and SDN's central access tandem where the customer's traffic is switched to originate or terminate its communications. It also provides for the switching facilities at SDN's central access tandem. SDN's central access tandem is SDN's switching system located in Sioux Falls, South Dakota which provides a concentration and distribution function for originating and terminating traffic between the end offices of Routing Exchange Carriers listed in Section 9[] following and a customer's point of termination. The customer's point of termination is the demarcation point or network interface between SDN's communications facilities located at the SDN tandem switch and customer provided facilities."). The SDN F.C.C. Tariff also provides, "Centralized Equal Access Service is available to customers that interconnect with SDN's facilities at SDN's central access tandem." Id. § 8.1.

To summarize, to recover under their tariffs, plaintiffs must demonstrate that they operated under a federally filed tariff and that they provided services to the customer pursuant to that tariff. Advamtel I, 118 F. Supp. 2d at 683. Under the terms of plaintiffs' tariffs, a defendant is a customer if it subscribed to plaintiffs' switched access services. NECA Tariff, § 2.6; SDN F.C.C. Tariff, § 2.6; LECA Tariff, § 2.6. While none of defendants affirmatively subscribed to

---

[12] The Routing Exchange Carriers apparently are the South Dakota LECs that formed SDN.

plaintiffs' services according to the ordering provisions of the tariffs, a defendant may be deemed under the constructive ordering doctrine to have subscribed to these services if the three-part test articulated in <u>Advamtel</u> is met. <u>See</u> <u>Advamtel I</u>, 118 F. Supp. 2d at 685. Thus, a defendant that meets all three requirements of the constructive ordering doctrine received services from plaintiffs pursuant to their tariffs, and is liable for the associated access charges.

### 1.    Onvoy

Plaintiffs allege that Onvoy is liable for the originating access charges associated with the Express traffic under the constructive ordering doctrine.[13] Onvoy moves for summary judgment on plaintiffs' claim, arguing that Onvoy was not plaintiffs' customer under the applicable tariffs and that the constructive ordering doctrine does not apply to the facts of this case.

---

[13] When Onvoy filed its motion for summary judgment, it was only named as a defendant in member cases Civ. 06-3023 and Civ. 06-3025. While this motion was pending, however, the court granted plaintiffs in member cases Civ. 06-4221, Civ. 06-4114, and Civ. 07-3003 leave to amend their complaints to add identical breach of implied contract claims against Onvoy. The new breach of implied contract claims against Onvoy in member cases Civ. 06-4221, Civ. 06-4114, and Civ. 07-3003 are virtually identically to the breach of implied contract claims against TNCI in member cases Civ. 06-3023 and Civ. 06-3025. Thus, just as the court did with the original claims, the court construes the new breach of implied contract claims against Onvoy as claims to recover amounts owed under plaintiffs' tariffs. The court also treats Onvoy's motion for summary judgment as applying to the breach of implied contract claim against Onvoy in all five member cases.

Onvoy argues that the constructive ordering doctrine only applies in cases where an IXC and an LEC share common customers for the provision of local and long-distance telephone services, as in <u>Advamtel, LLC v. Sprint Comm. Co., L.P.</u>, 125 F. Supp. 2d 800 (E.D. Va. 2001) (<u>Advamtel II</u>), or where an end user or IXC seeks to avoid responsibility for charges based on unauthorized access of its facilities, as in <u>City of New York</u>, 83 F.3d 549, and <u>Community Health Group</u>, 931 F. Supp. 719. Essentially, Onvoy's contention is that because these are the only types of cases in which courts have applied the constructive ordering doctrine, it follows that these are the only types of cases in which the constructive ordering doctrine can ever apply.

The court rejects Onvoy's contention. Nothing in any of the cases cited by Onvoy, or in <u>United Artists</u>, suggests that the constructive ordering doctrine is limited to the types of cases identified by Onvoy. Further, the present case is closer to <u>Advamtel II</u> than Onvoy suggests. While <u>United Artists</u>, <u>City of New York</u>, and <u>Community Health Group</u> all involved unauthorized or fraudulent use of the defendants' facilities, <u>Advamtel II</u>, 125 F. Supp. 2d 800, 801-02, applied the constructive ordering doctrine to an LEC's suit against an IXC to recover for unpaid access charges associated with traffic that did not involve fraud or unauthorized use of facilities. <u>See also</u> <u>Advamtel I</u>, 118 F. Supp. 2d 680, 681-82 (same general facts). Like in the <u>Advamtel</u> cases, here plaintiffs seek payment of unpaid access charges from long-distance providers, and there

is no allegation that the underlying traffic was fraudulent or unauthorized.

Onvoy points out factual distinctions between the present case and the

Advamtel cases, but does not indicate why these distinctions render the

constructive ordering doctrine inapplicable in this case. Thus, the court rejects

Onvoy's argument that the constructive ordering doctrine is not a valid

doctrine under the facts of this case.

Under the constructive ordering doctrine, Onvoy is liable for plaintiffs'

originating access charges if it (1) was interconnected in such a manner that it

could expect to receive access services, (2) failed to take reasonable steps to

prevent the receipt of services, and (3) did in fact receive such services. See

Advamtel, 118 F. Supp. 2d at 685.

Considering the first requirement of the constructive ordering doctrine,

there is a genuine dispute over whether Onvoy was interconnected in such a

manner that it could expect to receive access services from plaintiffs. Onvoy

contracted with Express to provide wholesale switchless long-distance services

provisioned through Onvoy's network. Under this agreement, Onvoy picked up

the Express traffic at SDN's tandem in Sioux Falls and carried it along its own

network. Thus, there are facts to show that Onvoy was physically

interconnected with SDN and plaintiff-LECs. There is a genuine dispute over

whether Onvoy could expect to receive access services from plaintiffs. Onvoy

asserts that it was Express that ordered SDN to direct the Express traffic to

Onvoy.  As evidence of this contention, Onvoy points to the fact that the Express traffic traveled from SDN's tandem to Onvoy's network with Express's CIC.  If Express did order SDN to direct the Express traffic to Onvoy, then Onvoy may not have expected to receive access services for itself.  Rather, Onvoy may have expected that Express was receiving access services.  On the other hand, plaintiffs assert that it was Onvoy that directed SDN to route the Express traffic to the Onvoy trunk group and Onvoy that supplied the T-1s to connect SDN's switch in Sioux Falls to Onvoy's switch in Plymouth.  Plaintiffs' assertions, if true, might show that Onvoy could expect to receive access services from plaintiffs.

There is also a genuine dispute over the third requirement of the constructive ordering doctrine, whether Onvoy in fact received services pursuant to plaintiffs' tariffs.  To analyze this requirement, the court must look to the definition of the services provided under the relevant tariffs.  MCI Worldcom Network Servs., Inc. v. Paetec Commc'ns, No. Civ.A.04-1479, 2005 WL 2145499, at *4 (E.D. Va. Aug. 31, 2005) (comparing the actual service provided with the definition of switched access service offered under the tariff).  Under plaintiff-LECs' tariffs, the NECA Tariff and the LECA Tariff, switched access service "provides a two-point communications path between a customer designated premises and an end user's premises."  NECA Tariff, § 6.1; LECA Tariff, § 6.1.  Under SDN's tariffs, the SDN F.C.C. Tariff and the SDN South

Dakota Tariff, switched access service is a communications path between plaintiff-LECs and SDN's centralized equal access tandem where customer's traffic is switched to originate or terminate its communications. SDN F.C.C. Tariff, § 6.1; SDN South Dakota Tariff, § 6.1. SDN's tariffs further provide that the "customer's point of interconnection is the demarcation point or network interface between SDN's communications facilities located at the SDN tandem switch and customer provided facilities." SDN F.C.C. Tariff, § 6.1; see also SDN South Dakota Tariff, § 6.1. Thus, the service offered under plaintiff-LECs' tariffs is a communications path between a customer-designated premises and an end user's premises. Likewise, the service offered under SDN's tariffs is the switching of traffic at the customer's point of interconnection. Based on the terms of the tariffs, the court finds that plaintiffs intended to offer a service that would connect traffic originating from plaintiff-LECs' end users to customers at a point designated or provided by the customer. See Penn Central Co. v. General Mills, Inc., 439 F.2d 1338, 1340-41 (8th Cir. 1971) ("[I]n interpreting a tariff, its terms must be taken in the sense in which they are generally used and accepted; and it must be construed in accordance with the meaning of the words used.").

There is a genuine dispute over whether Onvoy received switched access services as described in plaintiffs' tariffs. As noted, it is undisputed that Onvoy picked up the Express traffic at the SDN switch. But it is disputed whether

Onvoy or Express designated or provided the point at which plaintiffs should deliver the Express traffic. Onvoy asserts that Express instructed plaintiffs to deliver the traffic to Onvoy's trunks. Plaintiffs assert that Onvoy instructed plaintiffs to deliver the Express traffic to Onvoy's trunks, and Onvoy supplied the T-1s in order to connect at SDN's switch. This dispute over whether Onvoy designated or provided the point at which plaintiffs delivered traffic from end users goes to the material issue of whether Onvoy actually received the services provided in the tariffs.

Finally, there is a question of fact regarding the second requirement of the constructive ordering doctrine, that Onvoy failed to take reasonable steps to prevent receipt of services. Plaintiffs argue that the only evidence in the record that Onvoy attempted to prevent the receipt of services is that Onvoy disputed plaintiffs' bills for access service. But "[s]imply refusing to pay the tariff rate while continuing to permit calls to be routed . . . is insufficient to prevent access." Advamtel I, 118 F. Supp. 2d at 687. Whether Onvoy's assertion and belief that Express's ordering of the originating access services at issue in this case is an indication that Onvoy took reasonable steps to prevent receipt of services is a question for the trier of fact. Thus, there is a genuine issue of fact relating to the material issue of whether Onvoy failed to take reasonable steps to prevent the receipt of originating access services.

Overall, there are disputed issues of material fact with respect to whether Onvoy constructively ordered originating access services, and as a result became a customer under plaintiffs' tariffs and is therefore liable for originating access charges. Onvoy's motion for summary judgment on plaintiffs' claim for recovery of originating access charges is denied.

## 2. TNCI

Plaintiffs allege that TNCI is liable for the originating access charges associated with the Express traffic under the constructive ordering doctrine.[14] TNCI argues that it cannot be held liable for plaintiffs' originating access charges because it was not physically connected to plaintiffs, it never interacted or entered into a contract with plaintiffs, and it never submitted

---

[14] When TNCI filed its motion for summary judgment, it was only named as a defendant in member cases Civ. 06-3023 and Civ. 06-3025. While this motion was pending, however, the court granted plaintiffs in member cases Civ. 06-4221, Civ. 06-4114, and Civ. 07-3003 leave to amend their complaints to add identical breach of implied contract claims against TNCI. The new breach of implied contract claims against TNCI in member cases Civ. 06-4221, Civ. 06-4114, and Civ. 07-3003 are virtually identically to the breach of implied contract claims against TNCI in member cases Civ. 06-3023 and Civ. 06-3025. Thus, just as the court did with the original claims, the court construes the new breach of implied contract claims against TNCI as claims to recover amounts owed under plaintiffs' tariffs.

The court also treats TNCI's motion for summary judgment as applying to the breach of implied contract claim against TNCI in all five member cases. See Defendant TNCI's Memorandum in Support of its Motion for Summary Judgment, Docket 182 at 7 n.4 ("Because the claims are identical and purport to arise from the same operative facts and legal theory, TNCI also will be entitled to summary judgment on these claims should the Court grant these plaintiffs' leave to amend.").

access orders to plaintiffs. As noted, TNCI is liable for plaintiffs' originating access charges if it (1) was interconnected in such a manner that it could expect to receive access services, (2) failed to take reasonable steps to prevent the receipt of services, and (3) did in fact receive such services. See Advamtel I, 118 F. Supp. 2d at 685. Either it must be undisputed in favor of plaintiffs or there must be a genuine issue of material fact on each prong of the three-part test for plaintiffs to survive TNCI's motion for summary judgment.

The third requirement of the constructive ordering doctrine, that TNCI received services under plaintiffs' tariffs, is dispositive, so the court discusses it first. As noted, to analyze this requirement, the court must compare the services plaintiffs provided to TNCI, if any, with the definition of the services provided under the relevant tariffs. Paetec, 2005 WL 2145499, at *4. Under the undisputed facts and with all reasonable inferences drawn in favor of plaintiffs, the court finds that, as a matter of law, TNCI did not receive access services under plaintiffs' tariffs.

Looking first at plaintiff-LECs' tariffs, plaintiff-LECs provide a communications path between customer-designated premises and an end user's premises. NECA Tariff, § 6.1; LECA Tariff, § 6.1. But TNCI did not designate premises at which plaintiff-LECs delivered traffic originating from end users. Indeed, TNCI did not interact directly with plaintiff-LECs or maintain any facilities in South Dakota during the relevant times. At most,

34

TNCI designated and controlled the premises in Minnesota to which *Onvoy* delivered the Express traffic for transport to Global Crossing or Sprint. Plaintiff-LECs did not deliver the Express traffic to Minnesota. Rather, plaintiff-LECs delivered this traffic to SDN's switch in Sioux Falls, where it was picked up by Onvoy. Whatever communications path plaintiff-LECs provided in this case was not a path between TNCI-designated premises and an end user's premises. Thus, TNCI did not receive the services offered under plaintiff-LECs' tariffs.

Looking next at SDN's tariffs, TNCI also did not receive the services offered under these tariffs. Under its tariffs, SDN provides a two-point communications path between the transmission facilities of plaintiff-LECs and SDN's centralized equal access tandem in order to concentrate and distribute traffic between the end offices of plaintiff-LECs and the customer's point of termination or interconnection, where the customer's point of termination or interconnection is the demarcation point or network interface between SDN's communications facilities located at the SDN tandem switch in Sioux Falls and customer provided facilities. SDN F.C.C. Tariff, § 6.1; SDN South Dakota Tariff, § 5.1. TNCI did not provide any facilities at which SDN switched the Express traffic. Drawing all reasonable inferences in favor of plaintiffs, TNCI leased and controlled facilities in Minnesota at which Onvoy delivered traffic to be picked up or transferred to Global Crossing or Sprint. Indeed, it was Onvoy,

not TNCI, that carried the Express traffic from SDN's switch to the facilities at which the traffic was re-routed to Global Crossing or Sprint. Thus, SDN did not switch the Express traffic at a demarcation point or network interface between SDN's switch and TNCI-provided facilities, so it did not provide, and TNCI did not receive, the services offered in its tariffs.[15]

Plaintiffs argue that TNCI must have received services under plaintiffs' tariffs because otherwise, TNCI would not have had a product to sell. Plaintiffs' argument conflates "receiving" services with "benefitting from" services. The language in the relevant tariffs determines whether a party actually receives the services offered therein. See Paetec, 2005 WL 2145499, at *4. If TNCI received a service from plaintiffs in this case, it was not the service offered under their tariffs for the reasons set forth above. If TNCI benefitted from services performed pursuant to plaintiffs' tariffs, these services were not provided to TNCI. A party does not become liable for access charges just because it benefitted the provisioning of services. For example, in Paetec, Paetec, an LEC, attempted to charge MCI, an IXC, for switched access services provided under Paetec's tariff. Id. at *1-2. Paetec entered into contracts with

_____

[15] The ordering provisions of the SDN F.C.C. Tariff state that "Access Service between a customer's premises and the customer's point of termination at the SDN access tandem is solely the responsibility of the customer and must be provided by the customer or ordered from another carrier." SDN F.C.C. Tariff, § 5.1.1. There is no indication that TNCI ordered access services from another carrier to connect TNCI's point of termination at the SDN access tandem to TNCI's other premises.

other telecommunications carriers whose end users made toll-free, wireless calls to MCI's customers who had purchased toll-free service from MCI. Id. at *2. Paetec paid the carriers to route their end users' wireless calls to Paetec, so that Paetec could re-route the calls to MCI and charge MCI for originating access charges specified in Paetec's tariffs. Id. Thus, the service Paetec actually performed was the transmission of interstate toll-free calls made by end users of other telecommunications carriers to MCI. Id. at *4. But Paetec's tariff defined switched access service as "providing 'a two-point electrical communications path between a Customer's premises and an End User's premises," where "End User" was defined as "[a]ny customer of an interstate telecommunications service that is not a Carrier or Common Carrier." Id. (quoting relevant tariff). The court reasoned that because Paetec actually provided a communications path between MCI and the switching facilities of other telecommunications carriers that were not within the tariff's definition of end-users, Paetec did not provide a service within its tariff and MCI was not liable for access charges. Id. This was true even though MCI benefitted from the service provided by Paetec because MCI was able to terminate the calls to its toll-free customers.

Paetec is instructive in evaluating plaintiffs' claim that TNCI must have received services under the tariff because otherwise it would not have had a product to sell. TNCI entered into a contract with Onvoy under which TNCI

would arrange for transport service and long-distance connectivity for calls originating at Onvoy's facilities in Minnesota. If there were no calls originating at Onvoy's facilities because Onvoy did not receive them from plaintiffs, then TNCI's product of arranging for transport service and long-distance connectivity of these calls would be useless. Thus, in that sense, just like MCI benefitted from the fact that Paetec transmitted interstate toll-free calls made by end users of other carriers, TNCI benefitted from the fact that plaintiff-LECs and SDN transmitted the Express traffic to Onvoy. But, like in <u>Paetec</u>, the fact that TNCI benefitted from services provided by plaintiffs does not mean that TNCI actually received the access services offered in plaintiffs' tariffs. As the court already discussed, plaintiffs did not provide switched access services to TNCI because TNCI did not designate or provide facilities at which plaintiff-LECs or SDN transmitted the Express traffic.

Considering now the first requirement of the constructive ordering doctrine, that TNCI was interconnected in such a manner that it could expect to receive access services, the court finds as a matter of law that TNCI was not interconnected for the same reasons the court found that TNCI did not receive access services.[16] As previously discussed, in order to receive services under

---

[16] The court's finding that TNCI was not interconnected with plaintiffs is based on the language of the applicable tariffs, not on TNCI's argument that under <u>AT & T Corp. v. Federal Communications Commission</u>, 317 F.3d 227, 234-35 (D.C. Cir. 2003), the term "interconnect" refers "solely to the physical linking of two networks, and *not* to the exchange of traffic between networks."

plaintiffs' tariffs, a potential customer must designate or provide a point of connection with plaintiff-LECs and SDN. TNCI did not designate or provide premises at which plaintiffs transferred the Express traffic originating from plaintiff-LECs' end users, so it was not interconnected with plaintiffs in the manner required to receive switched access services as defined in plaintiffs' tariffs. TNCI may have designated, leased, and controlled the point at which Onvoy transferred the Express traffic for delivery to the underlying carriers, but traffic delivered by Onvoy is not covered by plaintiffs' tariffs.

Plaintiffs argue that TNCI must have been interconnected because otherwise it could not receive the Express traffic. But under plaintiffs' tariffs, the relevant point of interconnection is the point where plaintiffs transfer traffic to the customer, not a point later in the traffic flow. Furthermore, plaintiffs' argument would make any carrier that transferred a call at some point between the end user originating the call and the end user receiving the call liable for

---

AT & T Corp. v. Federal Communications Commission interprets the meaning of the word "interconnect" in § 251(a)(1) of the Communications Act, which provides that "[e]ach telecommunications carrier has the duty . . . to interconnect directly with the facilities and equipment of other telecommunications carriers." See id. at 234 (quoting 47 U.S.C. § 251(a)(1)). The court in AT & T Corp. v. Federal Communications Commission relied on the text of § 251(a)(1) and the structure of the following section, § 252, to determine that the term "interconnect" in § 251(a)(1) refers to a physical linking. Id. Here, the term "interconnect" comes before the court via the F.C.C.-created constructive ordering doctrine rather than via § 251(a)(1) or another statutory text. The court does not determine whether the word "interconnected," as used in the constructive ordering doctrine, always refers to a physical linking.

originating access charges.  Any time multiple carriers were involved, plaintiffs would be entitled to recover access charges associated with the same service from multiple carriers, a result prohibited by the filed rate doctrine.  See Qwest Corp. v. Scott, 380 F.3d 367, 375 (8th Cir. 2004) (explaining that regulated entities may charge only those rates set out in their tariffs and approved by the FCC).  Plaintiffs' argument is unconvincing, and the court finds as a matter of law that TNCI was not interconnected in such a way that it could expect to receive services in this case.

Because there are no genuine issues of material fact on the questions of whether TNCI received access services under plaintiffs' tariffs and was interconnected in such a manner that it could expect to receive access services, both of which are required for TNCI to be liable for originating access charges, the court need not consider the second requirement of the constructive ordering doctrine, that TNCI failed to take reasonable steps to prevent the receipt of services.  TNCI did not affirmatively or constructively order access services under plaintiffs' tariffs, so it is not a customer that received such services and is not liable for the associated originating access charges.  Neither plaintiff-LECs nor SDN billed TNCI for access charges, so there are no remaining factual issues to be resolved.  TNCI is entitled to judgment as a matter of law on plaintiffs' claim to recover originating access charges under their tariffs.

### 3.    Global Crossing

Plaintiffs allege that Global Crossing is liable for the originating access charges associated with the Express traffic under the constructive ordering doctrine.  Global Crossing argues that it cannot be held liable for plaintiffs' originating access charges because it was not a customer under plaintiffs' tariffs, was not interconnected with plaintiffs, and could not have taken any additional steps to avoid receipt of plaintiffs' services.  As noted, Global Crossing is liable for plaintiffs' originating access charges if it (1) was interconnected in such a manner that it could expect to receive access services, (2) failed to take reasonable steps to prevent the receipt of services, and (3) did in fact receive such services.  See Advamtel I, 118 F. Supp. 2d at 685.  Either it must be undisputed in favor of plaintiffs or there must be a genuine issue of material fact on each prong of the three-part test for plaintiffs to survive Global Crossing's motion for summary judgment.

As with TNCI's motion for summary judgment on plaintiffs' claims, the third requirement of the constructive ordering doctrine, that Global Crossing received services under plaintiffs' tariffs, is dispositive of Global Crossing's motion for summary judgment, so the court discusses it first.  As noted, to analyze this requirement, the court must compare the services plaintiffs provided to Global Crossing, if any, with the definition of the services provided under the relevant tariffs.  Paetec, 2005 WL 2145499, at *4.  Under the

undisputed facts and with all reasonable inferences drawn in favor of plaintiffs, the court finds that, as a matter of law, Global Crossing did not receive access services under plaintiffs' tariffs.

Looking first at plaintiff-LECs' tariffs, plaintiff-LECs provide a communications path between customer-designated premises and an end user's premises.  NECA Tariff, § 6.1; LECA Tariff, § 6.1.  But Global Crossing did not designate premises at which plaintiff-LECs delivered Express traffic originating from end users.  Indeed, Global Crossing did not interact directly with plaintiff-LECs with respect to the Express traffic.  Global Crossing set up access facilities in Minnesota in order to pick up the Express traffic from Onvoy's facilties and carry it to the called destination.  It is undisputed that plaintiff-LECs did not deliver the Express traffic to Global Crossing's facilities in Minnesota.  Rather, plaintiff-LECs delivered this traffic to SDN's switch in Sioux Falls, where it was picked up by Onvoy.  Whatever communications path plaintiff-LECs provided in this case was not a path between premises designated by Global Crossing and an end user's premises.  Thus, Global Crossing did not receive the services offered under plaintiff-LECs' tariffs with respect to the Express traffic.

Looking next at SDN's tariffs, Global Crossing also did not receive the services offered under these tariffs.  Under its tariffs, SDN provides a two-point communications path between the transmission facilities of plaintiff-LECs and

SDN's centralized equal access tandem in order to concentrate and distribute traffic between the end offices of plaintiff-LECs and the customer's point of termination or interconnection, where the customer's point of termination or interconnection is the demarcation point or network interface between SDN's communications facilities located at the SDN tandem switch in Sioux Falls and customer provided facilities. SDN F.C.C. Tariff, § 6.1; SDN South Dakota Tariff, § 5.1. Global Crossing did not provide any facilities at which SDN switched the Express traffic. Drawing all reasonable inferences in favor of plaintiffs, Global Crossing set up facilities in Minnesota in order to connect to Onvoy's facilities in that state. Indeed, it was Onvoy, not Global Crossing, that carried the Express traffic from SDN's switch to the facilities at which the traffic was re-routed to Global Crossing. Thus, SDN did not switch the Express traffic at a demarcation point or network interface between SDN's switch and Global Crossing-provided facilities, so it did not provide, and Global Crossing did not receive, the services offered in SDN's tariffs.

Considering now the first requirement of the constructive ordering doctrine, that Global Crossing was interconnected in such a manner that it could expect to receive access services, the court finds as a matter of law that Global Crossing was not interconnected for the same reasons the court found that Global Crossing did not receive access services. As previously discussed, to receive services under plaintiffs' tariffs, a potential customer must designate

or provide a point of connection with plaintiff-LECs and SDN.  Global Crossing did not designate or provide premises at which plaintiffs transferred the Express traffic originating from plaintiff-LECs' end users, so it was not interconnected with plaintiffs in the manner required to receive switched access services as defined in plaintiffs' tariffs.  Global Crossing may have designated facilities at which Onvoy delivered the Express traffic, but traffic picked up from Onvoy is not covered by plaintiffs' tariffs.

Plaintiffs argue that a direct connection is not required under the constructive ordering doctrine.  In support of their argument, plaintiffs cite <u>AT & T Communications of the Midwest</u>, 687 N.W.2d at 558, 561, a Supreme Court of Iowa case in which the court upheld the application of the constructive ordering doctrine to find an IXC liable for access charges where the traffic in question originated with the end users of LECs and was transferred by the LECs to a centralized equal access provider, where it was picked up by the IXC.  Plaintiffs argue that because the IXC in <u>AT & T Communications of the Midwest</u> was found to be interconnected with the LECs even though the traffic flowed from the LECs to the centralized equal access provider to the IXC, the constructive ordering doctrine does not require a direct connection.  Plaintiffs' argument is unavailing.  Plaintiffs' tariffs define access services and the way in which a customer must connect to plaintiffs to receive these services.  In this case, Global Crossing did not connect with plaintiffs in a

44

manner that it could expect to receive access services because it did not

designate or provide a point at which plaintiffs delivered the Express traffic.  It

is irrelevant that the IXC in <u>AT & T Communications of the Midwest</u> was found

to be connected to the LECs in such a way that it could receive access services

under the LECs' tariffs even though it was not directly connected.  Further, the

situation of the IXC in <u>AT & T Communications of the Midwest</u> is analogous to

the situation of Express or Onvoy, one of which received access services from

plaintiff-LECs and SDN by connecting to SDN's facilities in Sioux Falls, and not

Global Crossing, TNCI, or Sprint because these entities did not pick up the

traffic at the centralized equal access provider's switch.  The constructive

ordering doctrine does not require the receiver of services to pick up the traffic

from each individual LEC when the traffic flows through a centralized equal

access provider.  But this does not mean that an entity that does not connect

to the LECs' facilities or to the centralized equal access provider's facilities, but

rather picks up the traffic at a different point and from a different carrier, is

interconnected within the meaning of the constructive ordering doctrine.

Because there are no genuine issues of material fact on the questions of

whether Global Crossing received access services under plaintiffs' tariffs and

was interconnected in such a manner that it could expect to receive access

services, both of which are required for Global Crossing to be liable for

originating access charges, the court need not consider the second requirement

45

of the constructive ordering doctrine, that Global Crossing failed to take reasonable steps to prevent the receipt of services. Global Crossing did not affirmatively or constructively order access services under plaintiffs' tariffs with respect to the Express traffic, so it is not a customer that received such services and it is not liable for the associated originating access charges. Global Crossing is entitled to judgment as a matter of law on plaintiffs' claim to recover originating access charges associated with the Express traffic.

It is undisputed, however, that plaintiff-LECs and SDN submitted invoices to Global Crossing containing access charges associated with the traffic that traversed the Feature Group D facilities ordered by Global Crossing as well as access charges associated with the Express traffic. Global Crossing admits that it ordered access charges for the Feature Group D traffic, so a genuine factual issue remains regarding which charges Global Crossing must pay. Global Crossing's motion for summary judgment is denied for resolution of this sole remaining issue.

### 4. Sprint

Plaintiffs allege that Sprint is liable for the originating access charges associated with the Express traffic charged pursuant to plaintiffs' tariffs.[17]

---

[17] At the outset, the court notes that Counts I and II of the amended complaint against Sprint in member case Civ. 07-3003 are styled as claims for breach of contract and breach of an implied contract, respectively. But the amended complaint, when read as a whole, indicates that these counts are in fact claims to recover amounts owed under plaintiffs' tariffs. See First

Sprint argues that it was not a customer and did not receive access services under plaintiffs' tariffs because the word "subscribes" in the tariffs requires affirmative action taken by the subscribing party. Sprint asserts that it did not take any affirmative action to subscribe to plaintiffs' access services, so it is not liable for the amounts charged under plaintiffs' tariffs.

Sprint's argument that the word "subscribes" requires affirmative action misses the point of the constructive ordering doctrine applied by the court in this case. It is undisputed that Sprint did not subscribe to plaintiffs' switched access services in the manner set out in the relevant tariffs, so the meaning of the word "subscribes" in plaintiffs' tariffs is irrelevant. The court has explained that an entity may also subscribe to plaintiffs' access services by meeting all three requirements of the constructive ordering doctrine. See supra note 11. Thus, regardless of the dictionary definition of "subscribe," under the law as applied by this court, an entity that was interconnected in such a manner that it could expect to receive access services, failed to take reasonable steps to prevent receipt of access services, and in fact received such services

---

Amended Complaint, Docket 201, ¶ 1. Likewise, although Count I of the amended complaint in member case Civ. 06-4144 is styled as a breach of implied contract claim, the amended complaint as a whole indicates that Count I is actually a claim to recover amounts due under plaintiffs' tariffs, and the court construes it as such. See Second Amended Complaint, Docket 203, ¶ 1. The court previously construed the breach of implied contract claim against Sprint in member case Civ. 06-3025 as an action to recover amounts owed under plaintiffs' tariffs. Order, Docket 71 (Civ. 06-3025) at 6.

"subscribed" to the services offered in the tariff.  See Advamtel I, 118 F. Supp. 2d at 685.  Moreover, the constructive ordering doctrine itself requires affirmative action, so that if Sprint is deemed to have constructively ordered access services from plaintiffs, it must have taken some affirmative action to establish a customer relationship.  Id. at 687 ("As indicated in United Artists and City of New York, in order to find that a service has been constructively ordered, the carrier must show 'affirmative action . . . to establish a [customer] relationship.'  This affirmative action could be the result of the failure 'to take reasonable steps' to avoid receiving the carrier's services.") (internal citation omitted).

Thus, like Onvoy, TNCI, and Global Crossing, Sprint is liable for plaintiffs' originating access charges if it (1) was interconnected in such a manner that it could expect to receive access services, (2) failed to take reasonable steps to prevent the receipt of services, and (3) did in fact receive such services.  See Advamtel I, 118 F. Supp. 2d at 685.  Either it must be undisputed in favor of plaintiffs or there must be a genuine issue of material fact on each prong of the three-part test for plaintiffs to survive Sprint's motion for summary judgment.

As with TNCI's and Global Crossing's motions for summary judgment on plaintiffs' claims, the third requirement of the constructive ordering doctrine, that Sprint received services under plaintiffs' tariffs, is dispositive of Sprint's

motion for summary judgment, so the court discusses it first.  As noted, to analyze this requirement, the court must compare the services plaintiffs provided to Sprint, if any, with the definition of the services provided under the relevant tariffs.  <u>Paetec</u>, 2005 WL 2145499, at *4.  Under the undisputed facts and with all reasonable inferences drawn in favor of plaintiffs, the court finds that, as a matter of law, Sprint did not receive access services under plaintiffs' tariffs with respect to the Express traffic.

Looking first at plaintiff-LECs' tariffs, plaintiff-LECs provide a communications path between customer-designated premises and an end user's premises.  NECA Tariff, § 6.1; LECA Tariff, § 6.1.  But Sprint did not designate premises at which plaintiff-LECs delivered Express traffic originating from end users.  Indeed, the only facts relating to Sprint's involvement with the Express traffic indicate that Sprint set up a DS-3 access line to carry the Express traffic from Onvoy's facilities in Minnesota to the called destination via Sprint's network.  Sprint connected the DS-3 loop to an assigned circuit facility owned by Onvoy in Minnesota.  It is undisputed that plaintiff-LECs did not deliver the Express traffic to Onvoy's circuit facility in Minnesota or to the DS-3 loop set up by Sprint to connect to that facility.  Plaintiff-LECs delivered the Express traffic to SDN's switch in Sioux Falls, where it was picked up by Onvoy.  The communications path plaintiff-LECs provided in this case was not a path between premises designated by Sprint and an end user's premises.

Thus, Sprint did not receive the services offered under plaintiff-LECs' tariffs with respect to the Express traffic.

Looking next at SDN's tariffs, Sprint also did not receive the services offered under these tariffs. Under its tariffs, SDN provides a two-point communications path between the transmission facilities of plaintiff-LECs and SDN's centralized equal access tandem in order to concentrate and distribute traffic between the end offices of plaintiff-LECs and the customer's point of termination or interconnection, where the customer's point of termination or interconnection is the demarcation point or network interface between SDN's communications facilities located at the SDN tandem switch in Sioux Falls and customer provided facilities. SDN F.C.C. Tariff, § 6.1; SDN South Dakota Tariff, § 5.1. Sprint did not provide any facilities at which SDN switched the Express traffic. Drawing all reasonable inferences in favor of plaintiffs, Sprint set up a DS-3 loop that connected to an assigned circuit facility owned by Onvoy in Minnesota. Indeed, it was Onvoy, not Sprint, that carried the Express traffic from SDN's switch to the facilities at which the traffic was re-routed to Sprint. Thus, SDN did not switch the Express traffic at a demarcation point or network interface between SDN's switch and Sprint-provided facilities, so it did not provide, and Sprint did not receive, the services offered in its tariffs.

Considering now the first requirement of the constructive ordering doctrine, that Sprint was interconnected in such a manner that it could expect to receive access services, the court finds as a matter of law that Sprint was not so interconnected for the same reasons the court found that Sprint did not receive access services. As previously discussed, in order to receive services under plaintiffs' tariffs, a potential customer must designate or provide a point of connection with plaintiff-LECs and SDN. Sprint did not designate or provide premises at which plaintiffs transferred the Express traffic originating from plaintiff-LECs' end users, so it was not interconnected with plaintiffs in the manner required to receive switched access services as defined in plaintiffs' tariffs.

Because there are no genuine issues of material fact on the questions of whether Sprint received access services under plaintiffs' tariffs and was interconnected in such a manner that it could expect to receive access services, both of which are required for Sprint to be liable for originating access charges, the court need not consider the second requirement of the constructive ordering doctrine, that Sprint failed to take reasonable steps to prevent the receipt of services. Sprint did not affirmatively or constructively order access services under plaintiffs' tariffs with respect to the Express traffic, so it is not a customer that received such services and is not liable for the associated originating access charges. Sprint is entitled to judgment as a matter of law on

plaintiffs' claim to recover originating access charges associated with the Express traffic.

It is undisputed, however, that plaintiff-LECs and SDN submitted invoices to Sprint containing access charges associated with the traffic that traversed the Feature Group D facilities ordered by Sprint as well as access charges associated with the Express traffic. Sprint admits that it is liable for the access charges associated with the Feature Group D traffic and paid the charges for which it believed it was liable. But a genuine factual issue remains regarding whether Sprint accurately determined which charges it was obligated to pay. Sprint's motion for summary judgment is denied for resolution of this sole remaining issue.

### 5.    Summary

In sum, the court finds that there are disputed issues of material fact relating to the issue of whether Onvoy constructively ordered originating access services under plaintiffs' tariffs, and as such is liable for the associated access charges. On the other hand, the court finds as a matter of law that TNCI, Sprint, and Global Crossing did not receive access services under plaintiffs' tariffs with respect to the Express traffic, so they did not constructively order these services and become plaintiffs' customers under their tariffs. The court is aware of the parties' various contractual relationships and of the contractual provisions purporting to assign responsibility for paying originating access

charges to certain parties, but these contracts are not before the court at this time.  By their claims, plaintiffs seek to recover access charges owed pursuant to their tariffs, so the court is called on to determine whether plaintiffs provided each defendant with access services pursuant to their tariffs, a determination which requires comparing the services offered under plaintiffs' tariffs with the services actually provided in this case.  The question of whether a defendant is obligated by contract to pay access charges for the Express traffic can be raised by the parties in the appropriate forum.  Onvoy's motion for summary judgment on plaintiffs claim to recover amounts owed under their tariffs is denied, TNCI's motion for summary judgment on this claim is granted, and Global Crossing's and Sprint's motions for summary judgment are denied for resolution of the limited issue of the amounts properly charged by plaintiffs for access services that Global Crossing and Sprint admit to ordering and receiving.

### B.      Unjust Enrichment Claim Against Sprint

Sprint also moves for summary judgment on plaintiffs' unjust enrichment claim, arguing that it is entitled to judgment in its favor on this claim because the court dismissed plaintiffs' identical unjust enrichment claim against Global Crossing pursuant to the filed rate doctrine.  Plaintiffs' unjust enrichment claim alleges that Sprint was unjustly enriched when it received originating and terminating access services without paying for them.

As the court explained in dismissing plaintiffs' substantially similar unjust enrichment claims against Global Crossing,

> "[T]he purpose of the filed rate doctrine is to: (1) preserve the regulating agency's authority to determine the reasonableness of the rates; and (2) insure that regulated entities charge only those rates that the agency has approved or been made aware of as the law may require." Qwest Corp. v. Scott, 380 F.3d 367, 375 (8th Cir. 2004). The filed rate doctrine also prohibits courts from granting relief that would have the effect of changing the rate charged for services rendered pursuant to a valid tariff. See Hill v. BellSouth Telecommc'ns, Inc., 364 F.3d 1308, 1316 (11th Cir. 2004).
>
> . . . If plaintiffs are successful on their unjust enrichment claim, the court would order Global Crossing to pay plaintiffs the value of the benefit that Global Crossing received. See Hofeldt v. Mehling, 658 N.W.2d 783, 788 (S.D. 2003). The amount corresponding to value of the benefit received will likely be different than the amount Global Crossing would have to pay for the service pursuant to plaintiffs' tariffs. The court thus concludes that plaintiffs' unjust enrichment claim is barred by the filed rate doctrine.

Order, Docket 99 at 17-18.

Likewise, plaintiffs' unjust enrichment claim against Sprint might cause the court to have to determine the value of the benefit Sprint received, which would violate the filed rate doctrine. Thus, for the same reasons that the court granted Global Crossing's motion to dismiss plaintiffs' unjust enrichment claim, the court finds that Sprint is entitled to judgment as a matter of law on Global Crossing's claim of unjust enrichment against Sprint. Sprint's motion for summary judgment is granted with respect to this claim.

## II.  Plaintiffs' Motion for Summary Judgment on Global Crossing's Counterclaims

Plaintiffs move for summary judgment on Global Crossing's counterclaims.  Counts One, Two, Three, Four, Five, Six, Seven, and Ten of Global Crossing's ten-count counterclaim allege claims against plaintiffs.  Global Crossing specifically resisted plaintiffs' motion with respect to Counts One and Four.  Global Crossing did not address Counts Two, Three, Five, Six, and Seven in its response to plaintiffs' motion for summary judgment.  Finally, Global Crossing indicated that it interpreted the court's previous order as dismissing Count Ten without prejudice and that it had no intention of repleading this claim.

### A.  Counts One and Four: Unjust and Unreasonable Practices

In Count One, Global Crossing claims that plaintiffs violated the prohibition on unjust and unreasonable practices contained in § 201(b) of the Communications Act by charging Global Crossing for access services it did not purchase.  Similarly, in Count Four, Global Crossing claims that plaintiffs violated the F.C.C.'s Truth-in-Billing regulations by rendering bills to Global Crossing that failed to distinguish between the access services associated with the Express traffic and the access services associated with Global Crossing's Feature Group D facilities, and as a result committed unjust and unreasonable practices in violation of § 201(b).  Global Crossing essentially collapsed Counts One and Four into a single claim in its response to plaintiffs' motion for

summary judgment, so the court construes Counts One and Four as both alleging unjust and unreasonable practices in violation of § 201(b) arising out of violation of the F.C.C.'s Truth-in-Billing regulations.

In a footnote, Global Crossing asserts that its § 201(b) claim "is narrowed to an affirmative defense to the Plaintiff LECs' claims that Global Crossing owes them access charges on certain non-Express Traffic." Global Crossing's Memorandum of Law in Response to Motions for Summary Judgment of Express Communications and the Plaintiff Local Exchange Carriers, Docket 246 at 4 n.3. In the same footnote, Global Crossing further argues that the court should grant summary judgment in favor of Global Crossing on its § 201(b) claim. Id. Global Crossing did not comply with the local rules in requesting summary judgment on this claim, so its request is denied. See D.S.D. CIV. LR 56.1(A) (requiring that all motions for summary judgment be accompanied by a separate, short, and concise statement of the material facts); 7.2 (requiring motions raising a question of law to be accompanied by a brief containing the specific points or propositions of law with the authorities in support thereof on which the moving party relies). The court will address the merits of plaintiffs' motion for summary judgment on Global Crossing's § 201(b)/Truth-in-Billing counterclaim.

Section 201(b) provides in relevant part that "[a]ll charges, practices, classifications, and regulations for and in connection with . . . communication

service, shall be just and reasonable, and any such charge, practice, classification, or regulation that is unjust or unreasonable is declared to be unlawful." 47 U.S.C. § 201(b). The F.C.C.'s Truth-in-Billing Requirements indicate that:

> [c]harges contained on telephone bills must be accompanied by a brief, clear, non-misleading, plain language description of the service or services rendered. The description must be sufficiently clear in presentation and specific enough in content so that customers can accurately assess that the services for which they are billed correspond to those that they have requested and received, and that the costs assessed for those services conform to their understanding of the price charged.

47 C.F.R. § 64.2401(b). Failure to comply with this requirement constitutes an unjust and unreasonable practice in violation of § 201. "[T]o violate a regulation that lawfully implements § 201(b)'s requirements *is* to violate the statute." Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc., 550 U.S. 45, 54, 127 S. Ct. 1513, 167 L. Ed. 2d 422 (2007); see also Beattie v. CenturyTel, Inc., 234 F.R.D. 160, 172 (E.D. Mich. 2006) (suggesting that the Truth-in-Billing Requirements implement § 201(b)'s requirements).

The court has reviewed the bills provided to the court, see Docket 178-16 and 178-17, and finds that the bills do not distinguish between the access charges associated with the Express traffic and the access charges associated with the traffic that traversed the Feature Group D facilities Global Crossing ordered from plaintiffs. But a question of fact remains as to whether the bills are still "sufficiently clear in presentation and specific enough in content so

that [Global Crossing] can accurately assess that the services for which [it was]

billed correspond to those that [it has] requested and received." See 47 C.F.R.

§ 64.2401(b). This fact does not preclude summary judgment in favor of

plaintiffs, however, because Global Crossing has not set forth facts showing

that it sustained damages as a result of plaintiffs' potential violation of the

Truth-in-Billing Requirements.

Section 206 of the Communications Act, which confers a cause of action

for violation of § 201(b), provides that a cause of action for violation of the

provisions of the Communications Act only arises where the claimant is injured

and sustains damages. See also 47 U.S.C. § 207 ("Any person claiming to be

*damaged* by any common carrier subject to the provisions of this chapter . . .

may bring suit for the recovery of the *damages* for which such common carrier

may be liable." (emphasis added)). Here, because it is undisputed that Global

Crossing has refused to pay all of the charges on the relevant invoices and it

has not articulated any damages, and because the court has found that Global

Crossing is not liable for the originating access charges associated with the

Express traffic, the court now finds that Global Crossing did not sustain

damages as a result of plaintiffs' failure to delineate between the access

charges associated with the Express traffic and the access charges associated

with the Feature Group D traffic.

Global Crossing's citation to People's Network, Inc. v. American Tel. & Tel. Co., 1997 WL 165882, 12 F.C.C.R. 21081 (1997) is unavailing. Global Crossing argues that People's Network shows that a billing practice that is unreasonable may absolve the customer of whatever payment obligations it may otherwise have. People's Network involved backbilling practices, not violation of the contents and organization of bills. See id. at ¶ 17. Further, the F.C.C. did not award damages or absolve the customer of its obligation to pay the backbilled charges in People's Network. Rather, the F.C.C. allowed the customer to file a supplemental complaint for damages. Id. ("Consistent with our findings in this case, to the extent that TPN has established in its complaint that it experienced backbilling delays exceeding 120 days in connection with AT&T's SDN service offerings, it may file a supplemental complaint for damages as provided in section 1.722 of the Commission's Rules."). People's Network does not support the proposition that Global Crossing sustained damages as a result of plaintiffs' potential violation of the Truth-in-Billing Requirements or that Global Crossing is entitled to have its obligation to pay for the access charges associated with the Feature Group D traffic it acknowledges ordering and receiving absolved.

Because Global Crossing has not alleged any damages resulting from plaintiffs' potential violation of the Truth-in-Billing Requirements, plaintiffs' motion for summary judgment on this claim is granted.

## B.      Counts Two and Seven: Discriminatory Practices

In Count Two, Global Crossing claims that plaintiffs violated the
prohibition on unjust and unreasonable discriminatory practices contained in
§ 202(a) of the Communications Act.  Section 202(a) states:

> [i]t shall be unlawful for any common carrier to make any unjust
> or unreasonable discrimination in charges, practices,
> classifications, regulations, facilities, or services for or in
> connection with like communication service, directly or indirectly,
> by any means or device, or to make or give any undue or
> unreasonable preference or advantage to any particular person,
> class of persons, or locality, or to subject any particular person,
> class of persons, or locality to any undue or unreasonable
> prejudice or disadvantage.

47 U.S.C. § 202(a).  To prove a violation of § 202(a), Global Crossing must
establish three elements: "(1) whether the services are 'like'; (2) if so, whether
the services were provided under different terms or conditions; and (3)
whether any such difference was reasonable."  Nat'l Commc'ns Ass'n, Inc. v.
AT & T Corp., 238 F.3d 124, 127 (2d Cir. 2001); see also Panatronic USA v.
AT & T Corp., 287 F.3d 840, 844 (9th Cir. 2002); MCI Telecomms. Corp. v.
F.C.C., 917 F.2d 30, 39 (D.C. Cir. 1990).

In Count Seven, Global Crossing claims that plaintiffs violated the
analogous state statute, SDCL 49-31-11.  SDCL 49-31-11 provides:

> [n]o person or telecommunications company may unjustly or
> unreasonably discriminate between persons in providing
> telecommunications services or in the rate or price charged for
> those services.  No telecommunications company may offer a rate
> or charge, demand, collect or receive from any person a greater or
> lesser compensation for any telecommunications service offered

than it charges, demands, collects or receives from any other person for providing a like telecommunications service. No telecommunications company may make or give any unjust or unreasonable preference or advantage to any person, nor unjustly or unreasonably prejudice or disadvantage any person, in the provision of any telecommunications service.

SDCL 49-31-11.

Global Crossing did not defend its claims that plaintiffs engaged in unjust and unreasonable discrimination in violation of § 202(a) and SDCL 49-31-11 in its response to plaintiffs' motion for summary judgment. Thus, the court finds that Global Crossing has not set forth specific facts showing that plaintiffs provided like services to Global Crossing and another recipient of services, that these services were provided under different terms or conditions, and that such difference was unreasonable. Likewise, Global Crossing has not set forth specific facts showing that plaintiffs violated the prohibitions in SDCL 49-31-11.[18] As a result, plaintiffs are entitled to summary judgment on Counts Two and Seven of Global Crossing's counterclaim.

### C.    Counts Three and Six: Charges in Violation of Filed Tariffs

In Count Three, Global Crossing claims that plaintiffs violated § 203(c) of the Communications Act by charging for services rendered in a manner inconsistent with plaintiffs' filed tariffs. Section 203(a) requires

---

[18] It is unclear whether South Dakota law confers a private right of action to sue for violation of SDCL 49-31-11. Because Global Crossing has not set forth any specific facts creating a genuine issue for trial regarding whether plaintiffs violated SDCL 49-31-11, the court need not decide this issue.

telecommunication carriers to file schedules (tariffs) with the FCC showing all charges and showing the classifications, practices, and regulations affecting such charges. 47 U.S.C. § 203(a). Section 203(c) provides,

> [n]o carrier shall (1) charge, demand, collect, or receive a greater or less or different compensation for such communication, or for any service in connection therewith, between the points named in any such schedule than the charges specified in the schedule then in effect, or (2) refund or remit by any means or device any portion of the charges so specified, or (3) extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges, except as specified in such schedule.

47 U.S.C. § 203(c). Global Crossing asserts that plaintiffs violated § 203(c) by charging Global Crossing for access services that were not included in their tariffs. Section 206 provides that common carriers are liable for violations of the Communications Act to the "person or persons injured thereby for the full amount of damages sustained in the consequence of any such violation." 47 U.S.C. § 206.

Without deciding whether plaintiffs' actions of billing Global Crossing for access services where the court found that Global Crossing did not receive the services pursuant to plaintiffs' tariffs constitutes a violation of § 203(c), the court finds that plaintiffs are entitled to summary judgment on this claim because Global Crossing has not set forth specific facts showing that it was injured by plaintiffs' acts. Section 206 clearly states that a cause of action for violation of the provisions of the Communications Act only arises where the

claimant is injured and sustains damages.  <u>See also</u> 47 U.S.C. § 207 ("Any

person claiming to be damaged by any common carrier subject to the

provisions of this chapter . . . may bring suit for the recovery of the *damages*

for which such common carrier may be liable." (emphasis added)).  Because

Global Crossing failed to defend its § 203(c) claim in its response to plaintiffs'

motion for summary judgment, Global Crossing has not set forth specific facts

showing that it was injured or damaged by plaintiffs' actions.  As a result, the

court finds that plaintiffs are entitled to summary judgment in their favor on

Global Crossing's claim that plaintiffs violated § 203(c).

Similarly, in Count Six, Global Crossing claims that plaintiffs violated the

analogous state law, SDCL 49-31-12.2(3).  SDCL 49-31-12.2(3) provides that

"[a]ny telecommunications company subject to this chapter for noncompetitive

and emerging competitive telecommunications services shall . . . not deviate

from any of its current published rates."  SDCL 49-31-12.2(3).  Assuming that

Global Crossing has a private cause of action to sue plaintiffs for violation of

SDCL 49-31-12.2, which is not clear to the court, the court finds that Global

Crossing has not set forth sufficient facts showing that plaintiffs deviated from

any of their current published rates in charging Global Crossing for access

services to survive plaintiffs' motion for summary judgment.  Global Crossing

has not alleged or presented any facts showing that plaintiffs billed Global

Crossing at a rate different than that set forth in their tariffs.  Thus, there are

no genuine issues of material fact with respect to Global Crossing's claim that plaintiffs violated SDCL 49-31-12.2(3)'s prohibition on deviation from plaintiffs' published rates, and as a result plaintiffs are entitled to summary judgment on this claim.

### D. Count Five: Attorneys' Fees Under Communications Act

In Count Five, Global Crossing seeks to recover attorneys' fees for the alleged violations of the Communications Act pursuant to § 206.  Because the court has granted summary judgment in favor of plaintiffs on all of Global Crossing's claims arising out of alleged violations of the Communications Act, Global Crossing is not entitled to an award of attorneys' fees.  Plaintiffs' motion for summary judgment is granted with respect to Count Five.

### E. Count Ten: Deceit

Finally, in Count Ten, Global Crossing asserts a claim for deceit against plaintiffs as well as Express, Onvoy, and TNCI.  In granting Onvoy's motion to dismiss this claim for failure to plead with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure, the court stated, "Global Crossing's claim for deceit is dismissed without prejudice to Global Crossing's ability to amend the third-party complaint to comply with Rule 9(b)."  Order, Docket 99 at 45.  Global Crossing has not repleaded its deceit claim.  <u>See</u> Form 35 Report, Docket 124 at 7 ("The Third-Party Complaint originally included fraud claims, which the Court dismissed without prejudice.  Global Crossing does not

presently intend to replead those claims.").  And, although the court's order addressed only Onvoy's motion to dismiss, the parties have interpreted the order as dismissing Global Crossing's deceit claim with respect to all of the counterclaim and third-party defendants.

In any case, plaintiffs are entitled to summary judgment on Global Crossing's claim of deceit because there is no genuine issue as to any material fact on this claim.  Global Crossing's tort claim for deceit is governed by SDCL 20-10-1, which states: "One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers."  SDCL 20-10-1.  SDCL 20-10-2 defines deceit as:

(1)    The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;

(2)    The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;

(3)    The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4)    A promise made without any intention of performing.

SDCL 20-10-2.  Global Crossing has not set forth evidence of any specific statements or actions by plaintiffs (or any of the other counterclaim and third-party defendants) that fall within the definition of deceit.  Under South Dakota law, specific material facts must be presented to prevent summary judgment on fraud and deceit claims.  Bruske v. Hille, 567 N.W.2d 872, 876 (S.D. 1997).

In the absence of any specific facts supporting Global Crossing's allegation of

deceit, plaintiffs are entitled to summary judgment on this claim.

### III.  Express's Motion for Summary Judgment on Global Crossing's and Sprint's Cross-Claims

Express moves for summary judgment on Global Crossing's and Sprint's

third-party claims against it.  Global Crossing brought claims of quantum

meruit/unjust enrichment[19] and deceit against Express.  With respect to

Global Crossing's deceit claim, this claim is not supported by specific material

facts sufficient to overcome summary judgment for the reasons further

explained above.  As a result, Express is entitled to summary judgment on this

claim.

With respect to Global Crossing's claim of quantum meruit/unjust

enrichment, Global Crossing states that this claim is conditional on Global

Crossing's liability for access charges under plaintiffs' tariffs.  That is, "Global

Crossing's claim against Express . . . comes into play if and only if the Court

concludes that . . . Global Crossing was the customer of the Plaintiff LECs'

access services."  Global Crossing's Memorandum of Law in Response to

Motions for Summary Judgment of Express Communications and the Plaintiff

Local Exchange Carriers, Docket 246 at 5.  Because the court granted

_____

[19] This count also purports to assert a claim for constructive trust.  A constructive trust, however, is a remedy for a meritorious claim of unjust enrichment, not a separate substance cause of action.  See, e.g., Rosebud Sioux Tribe v. Strain, 432 N.W.2d 259, 264 (S.D. 1988).

summary judgment in favor of Global Crossing on plaintiffs' claims to recover originating access charges associated with the Express traffic, Global Crossing's claim of quantum meruit/unjust enrichment against Express is moot, and Express's motion for summary judgment on this claim is denied. See Mumid v. Abraham Lincoln High Sch., No. 0:05-CV-2176 (PJS/JJG), 2008 WL 2811214, at *12 (D. Minn. July 16, 2008) (denying as moot third-party defendant's motion for summary judgment on indemnification claim where defendant/third-party plaintiff's motion for summary judgment on the underlying complaint was granted).

Similarly, Sprint brought a claim of indemnification against Express, seeking recovery from Express for any charges Sprint may be ordered to pay to plaintiffs. Because the court granted summary judgment in favor of Sprint on all of plaintiffs' claims, Express's arguments against indemnification are moot and the court therefore denies Express's motion for summary judgment. Id.

IV. **Conclusion**

For the reasons set for herein, it is hereby

ORDERED that Onvoy's motion for summary judgment on plaintiffs' claims (Docket 187) is denied.

IT IS FURTHER ORDERED that TNCI's motion for summary judgment on plaintiffs' claims (Docket 181) is granted.

IT IS FURTHER ORDERED that Global Crossing's motion for summary judgment on plaintiffs' claims (Docket 175) is denied.

IT IS FURTHER ORDERED that Sprint's motion for summary judgment on plaintiffs' claims (Docket 188) is granted in part and denied in part, as further explained herein.

IT IS FURTHER ORDERED that plaintiffs' motion for summary judgment on Global Crossing's counterclaims (Docket 236) is granted.

IT IS FURTHER ORDERED that Express's motion for summary judgment on Global Crossing's and Sprint's third-party complaints (Docket 240) is granted in part and denied as moot in part, as further explained herein.

IT IS FURTHER ORDERED that Onvoy's request for oral argument (Docket 187), Global Crossing's request for oral argument (Docket 175), Sprint's request for oral argument (Docket 188), plaintiffs' request for oral argument (Docket 236), and Express's request for oral argument (Docket 240) are denied as moot.

Dated September 29, 2009.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE